W. B. MURPHY, Appellant, v. JAMES WILLIAMSON, Appellee.

**MASTER AND SERVANT:** The Relation—Contract Creating—Implied Obligations. One who contracts to furnish a home to another and his family impliedly agrees to treat such other and all members of the family with reasonable kindness and consideration. Evidence reviewed, and held to establish such harsh and inconsiderate treatment as to justify the other party to the contract in abandoning the same.

**CONTRACTS:** Construction—Entire or Severable Contracts. It is persuasive that a contract is *non-severable* when the value of the different elements of benefit accruing thereunder cannot be separately determined with any fair degree of accuracy.

PRINCIPLE APPLIED: An employee contracted to furnish for 10 years, on the employer's farm, the services of himself, wife and minor son. The employer, in return, agreed to compensate the employee as follows:

1. To pay $20 at the end of each month.

2. To pay, at the end of said 10 years, a sum equal to $20 per month, with 4% interest on such deferred sums.

3. To pay, at the end of said 10 years, $500 in addition to the above.

4. To furnish the entire family with a home and to pay for all living expenses except for clothing.

5. To furnish the said minor son with certain school advan-tages.

*Held*, the contract was non-severable.

MASTER AND SERVANT: Services and Compensation—Non-Severable Contract—Breach—Measure of Damages. A breach by a master of a non-severable *contract* of employment arms the servant with the right to recover the *reasonable value* of the services already performed, irrespective of the compensation provided by the breached contract.

PRINCIPLE APPLIED: See No. 2.

APPEAL AND ERROR: Review—Parties Entitled to Allege Error—Pleadings—Belated Objections. A party may not face an indefinite and ambiguous pleading in the trial court, make no objection thereto, permit the trial court to place an allowable construction thereon, and, on appeal, for the first time, raise an objection of insufficiency.

MASTER AND SERVANT: Compensation—Contract Providing for Compensation—Quantum Meruit—Pleading. An allegation that services for which recovery is sought were rendered under a contract *which specified the compensation receivable*, does not necessarily exclude evidence of the reasonable value of the services. So held where the services were rendered under a non-severable contract wrongfully breached by the master.

*Appeal from Iowa District Court.—R. P. Howell, Judge.*

Tuesday, June 19, 1917.

Action for damages for breach of contract. The defendant denied the breach on his part, and counterclaimed against the plaintiff for damages for breach on his part of the same contract. There was a verdict for the defendant on the counterclaim, and the plaintiff appeals.—*Affirmed.*

*W. E. Wallace,* for appellant.

*Popham & Havner,* for appellee.

Evans, J.—Plaintiff's petition was in two counts. The first count declared upon a promissory note, which was admitted by the defendant in his answer. Plaintiff's second count pleaded a written contract,

1. MASTER AND SERVANT: the relation: contract creating: implied obligations.

whereby the plaintiff contracted for the services of the defendant and of his wife and son for a period of 10 years; alleged that the defendant, after rendering services thereunder for a period of 9⅔ months, breached and abandoned the same, and that the plaintiff was thereby damaged in the sum of $1,100. The defendant admitted the execution of the contract; denied breach thereof on his part; and averred that the plaintiff himself breached the same by conduct rendering its performance impossible. The issue of fact towards which the evidence was principally directed was whether the conduct of the plaintiff was such, during the period of partial performance of this contract, as to justify its abandonment by the defendant.

The contract was entered into on February 15, 1913. Under its provisions, the defendant Williamson and his wife and son were to work for the plaintiff Murphy at his home and upon his farm for a period of 10 years. Murphy undertook on his part to pay a compensation of $20 per month at the end of each month, and the further sum of $20 per month at the expiration of the 10-year period, with 4 per cent interest on deferred payments, and an additional lump sum of $500 at the expiration of such 10-year period. He further agreed that the son, then a boy 11 years of age, should have certain school privileges, and that he would provide a home for the family, and would pay all their living expenses except for clothing. The parties operated under this contract from February 15th to the close of the corn husking season, December 5, 1913, on which date Williamson and his family left. The principal complaint of Williamson against Murphy was that of harsh and unwarranted treatment of the boy.

On the theory that Williamson breached the contract, the plaintiff claimed, as his measure of damage, the difference between the contract price and the market value of the future service. In support of such measure of damage,

he introduced testimony to the effect that such future service would have been worth from $45 to $55 per month. On such basis, he claimed damages to the extent of $1,100.

On the other hand, on the theory that Murphy breached the contract, the defendant Williamson elected and claimed to recover as on *quantum meruit* the value of the services rendered by him under the contract. He also introduced evidence to the effect that the services of himself and wife were worth approximately the same amount as was shown by the testimony for the plaintiff.

The decisive questions, therefore, were: (1) Who breached the contract? (2) If Murphy breached it, what was the proper measure of recovery on the counterclaim?

1. The jury found for the defendant, and allowed him a recovery of the value of the services, regardless of the contract price. It is earnestly urged, on behalf of the plaintiff, that the verdict was a grave miscarriage of justice, and was without support in the evidence. The amount of the verdict is consistent with the evidence on both sides, and was not excessive in any sense, unless such amount should have been limited by the contract price. This question will be discussed in the next paragraph hereof. The argument of insufficiency of the evidence is directed principally to the proposition that the contract was not breached by Murphy.

Murphy appears to have been a single man, whether a bachelor or a widower does not appear. He lived on a farm. His mother had previously lived with him, but had died shortly prior to the date of this contract. He had a housekeeper, who had been in the family for many years, and who remained with him. There were no other members of the family. The Williamsons were taken into this home. Mrs. Williamson did work both inside and outside upon the farm. Mr. Williamson engaged in the general farm work on the place, and did also carpenter and mason work.

No friction arose over the work of either Mr. or Mrs. Williamson, nor has their efficiency been questioned in any manner by plaintiff. Both Williamson and his wife were grieved over the conduct of Murphy toward the boy. Each of them took occasion to speak to him on the subject at different times, but met only with rebuff. "Son of a bitch" and "bastard" were names which Murphy frequently applied to the boy. On some occasions, he also "jerked" him and "choked" him. As a witness, Murphy denied that he had ever called the boy harsh names or had ever laid his hands upon him. The jury, however, must have found against him at this point. Such fact being found against him, needless to say that his conduct would operate as a great strain upon the father and mother, and would render it exceedingly difficult, if not impossible, for them to continue in the contract relations. Inasmuch as the contract provided for a home for the family, reasonably considerate treatment of each member of the family was an implied obligation thereof. Not only was the evidence legally sufficient to sustain the finding of the jury in that respect, but the testimony of the Williamsons has much corroboration in the circumstances. The testimony of Murphy himself discloses a misconception of his obligation under the contract. He testified:

"I had treated Mr. Williamson all right. Mr. Williamson never claimed I had mistreated him. * * * I told him I was not in any way responsible for his wife, and I did not contract with her."

Concerning an interview with Mrs. Williamson, he testified as follows:

"I think the boy told Mrs. Williamson something, for she jumped on to me about it, and I told her to just tend to her own business and there would be no trouble. I think she charged me with scolding or trying to choke him, and I told her I never did it. I think Mr. Williamson sat on the steps of the house at that time."

The record clearly indicates that Murphy was of dominant spirit, while Williamson and his wife were the very contrary. Williamson was a man wholly without means, and therefore wholly dependent. He came from California to enter upon this service for Murphy. The expense of the trip was advanced by Murphy, and the note sued on herein was given for such expense money. Williamson was, therefore, under great disadvantage to cope with Murphy, even in defense of his own son. Murphy doubtless had his good qualities, but other moods are quite prominent in this record. He was concededly a profane man, though he introduced witnesses who testified that they had never heard him swear. From some of his own witnesses, it appeared that "son of a bitch" was not an unusual epithet for him, though one witness testified that he never heard him use it except as applied to "machinery" and "horses."

On the morning of the day of final separation, Murphy staged a scene which must be regarded as furnishing some index to his capacity for sarcasm. He called the Williamsons into a room, and called in others also, as witnesses, who were without interest or business in the controversy. He there read the contract to the Williamsons, and followed this by reading a chapter from the Bible. This latter was confessedly not done as an act of piety. His own testimony concerning this circumstance was as follows:

"I think I asked Mr. Williamson that morning to stay. The morning they left, I got the Bible and read to them the twenty-second chapter of Matthew. Mr. and Mrs. Williamson and Isaac were present; also Robert Batty and young Nicewander. I did not make any remark to them about the passage, except I told them that my brother, who was a Methodist minister, had recommended the reading of the Bible in the family, and I had selected that chapter as a very appropriate one for that occasion. That was the first time I had read it to them since they came, but I read it

quite often myself. This occurred at the same time we were all talking about the Williamsons' leaving. * * * I thought the chapter in Matthew in reference to the betrayal of Peter was most appropriate. I told them my brother had recommended the reading of the Scripture, and I thought Mr. Williamson was just as big a traitor as Peter. My brother is a Methodist minister, and is a great friend of Mr. Williamson. My brother lived at the same place in Kansas as Mr. Williamson did."

No useful purpose can be served by pursuing further the details of the evidence. It is sufficient to say that we have no doubt of its sufficiency to sustain the finding of the jury that Murphy's conduct amounted to a breach of the contract, and therefore justified the abandonment thereof by Williamson.

2. As already indicated, the trial court

2. CONTRACTS: construction: entire or severable contracts. allowed Williamson to prove the value of the service rendered, regardless of the provisions of the contract. The contention for the appellant at this point is that the contract was a severable one, and that, therefore, it amounted to successive contracts month by month, and thereby fixed the compensation for all past services rendered. If this were a case of severable contract, providing for a fixed rate per month, there is much authority for saying that the value of past services rendered and paid for would be controlled by the terms of the contract. It is very clear, however, to our minds that the contract before us is not a severable contract in such sense. In *Pacific Timber Co. v. Iowa Windmill Co.*, 135 Iowa 308, we said:

"As a general rule, it may be said that a contract is entire when, by its terms, nature and purpose, it contemplates and intends that each and all of its parts and the consideration shall be common each to the other and interdependent. On the other hand, it is the general rule that

a severable contract is one in its nature and purpose suscep-
tible of division and apportionment. The question whether
a given contract is entire or separable is very largely one of
intention, which intention is to be determined from the lan-
guage the parties have used and the subject-matter of the
agreement. The divisibility of the subject-matter or the
consideration is not necessarily conclusive, though of aid
in arriving at the intention. * * * Where it reason-
ably appears from the language of the contract or from its
terms that the parties intended that a full and complete
performance should be made with reference to the subject-
matter of the contract by one party in consideration of the
obligation of the other party to the contract, it is said
to be entire. It is very difficult to lay down a rule which
will apply to all cases, and consequently each case must
depend very largely upon the terms of the contract in-
volved."

In *Hanson & Linehan v. Consumers' Steam Heating Co.*,
73 Iowa 77, 79, we said:

"It is very clear, we think, that the contract was sever-
able. Plaintiffs undertook to deliver so much coal as de-
fendant might require in its business during the time
covered by the agreement. The coal was to be delivered
from time to time, as it would be required in the business,
and defendant undertook to pay on the 10th day of each
month, at the stipulated price per ton, for such coal as
should be delivered during the preceding month. At the
end of any month, the rights and obligations of the par-
ties, so far as they related to the coal delivered during the
month, were settled and determined by the contract, and
they were not dependent upon whether anything further
should be done under it or not. Plaintiffs were entitled
absolutely to be paid for the property on the 10th day of
the following month, and they could maintain an action
at that time for the recovery of the stipulated price."

It will be noted that the contract be-

**8. MASTER AND SERVANT: services and compensation: nonseverable contract: breach: measure of damages.** fore us was not simply a contract for $40 per month for 10 years, payable monthly. A home was to be provided, and all the expenses of the family, save for clothing, were to be paid; payment of $20 per month was to be deferred until the end of the 10-year period; a lump payment of $500 was to be made at the end of such period; schooling privileges were to be had for the boy. The benefits to accrue to the defendant could not be apportioned by any mathematical process. If they were apportioned at all, evidence would have to be taken on the question of the value of home privileges and the expense attendant thereon. This would be an uncertain field. We think, therefore, that the contract should be deemed an entirety. The defendant having been deprived of its benefits by the wrongful acts of the plaintiff, he should not be prevented thereby from showing the fair market value of the services rendered. Testimony in support of such measure of recovery could be much more intelligent and satisfactory and definite than any testimony could be which would attempt to measure the value of home and school privileges. The question here presented has not been heretofore expressly discussed by us. But the rule adopted by the trial court was impliedly approved at least in *Barr v. Van Duyn*, 45 Iowa 228, *Thompson & Son v. Brown*, 106 Iowa 367, 372, *Hemminger v. Western Assurance Co.*, (Mich.) 54 N. W. 949, 950.

Appellant urges that the trial court held the contract to be severable, and that such holding is binding upon the appellee on this appeal. The trial court did not purport in terms to hold that the contract was severable. Appellant points to Instruction 13 given by the court, and argues that its necessary effect was to hold that the contract was severable. By this instruction, the trial court charged the jury that, if the defendant was not justified in abandoning

the contract, then he could not recover in excess of the rate of compensation provided by the contract, and that he could recover only the present worth of the payments deferred under the terms of the contract. Such instruction carries no implication or inference as to whether the contract was entire or severable.' Whichever it was, the defendant's measure of recovery would be the same in the event that he himself breached the contract.

3. Much emphasis is laid in appellant's argument upon the insufficiency of the defendant's pleading of his counterclaim to sustain any allowance thereon in his favor. The defendant's pleading is fairly subject to much of the criticism made upon it. It does not in direct terms plead a breach of the contract by the plaintiff. It does, however, allege the acts of misconduct of plaintiff which would constitute a breach, and these acts are put forth as the reasons of the abandonment of the contract by the defendant. The pleading is also somewhat indefinite and ambiguous as to whether it was intended therein to plead a mutual abandonment of the contract by consent of the plaintiff or whether it was intended to justify the abandonment against the will of the plaintiff by reason of his wrongful acts. The plaintiff might well have assailed the pleading and required that it be made more definite and specific. But it was in no manner assailed in the trial court. The trial court construed the counterclaim as a demand for damages, based upon breach of the contract by the plaintiff, and instructed the jury on that theory. The pleadings would bear such construction. If it had been assailed, the trial court would have construed it more strongly against the pleader. and would have required an amendment accordingly. In the absence of attack in the trial court, it is our duty on appeal to construe the pleading most strongly in support of the

4. APPEAL AND ERROR: review: parties entitled to allege error: pleadings: belated objections.

judgment. The plaintiff was not privileged to reserve his fire and to make an initial attack upon the pleadings in this court. True, the plaintiff, as appellant, claims that the evidence received on such theory was irrelevant and immaterial. Of course it would be such if his attack upon the pleading should be sustained. His brief here characterizes the pleading as an "attempt to plead a counterclaim." That it was such an attempt is very manifest upon the face of the pleading, whatever its shortcomings. If the court improperly construed it, no question of that kind was raised at the trial. The trial proceeded upon the theory here indicated. The plaintiff did object to the evidence of *quantum meruit* as irrelevant and immaterial. If this was intended to reach the insufficiency of the pleadings, it was mere ambush. Furthermore, the evidence thus objected to was in fact both relevant and material, if for no other reason than that it was responsive to the evidence which plaintiff had introduced in support of his own claim for damages.

5. MASTER AND SERVANT: compensation: contract providing for compensation: *quantum meruit*: pleading.

4. It is further urged that the defendant in his counterclaim pleaded that the services rendered by him were rendered *under the contract*. It is argued, therefore, that this allegation, of itself, would forbid proof of a *quantum meruit* as a basis of damages. It appears that this point was first sustained by the trial court. Later, after an amendment, the ruling was withdrawn, and the evidence was permitted to stand. We think the later ruling was clearly correct, and would have been correct in the first instance. The services *were* rendered under the contract, without any dispute. It was for that reason that the defendant was entitled to recover damages for breach of the contract on the part of the plaintiff. The fact that one party breaches a contract after it has been partly performed by the other party does not preclude such other party from

pleading such performance, nor from proving his damages for such breach upon a basis of *quantum meruit*.

The foregoing presents the principal questions argued in the briefs. While we have not dealt in detail with all the assignments of error, what we have here said is decisive of them all. We find no prejudicial error. The judgment below is, therefore,—*Affirmed*.

GAYNOR, C. J., LADD and SALINGER, JJ., concur.